IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SHAMUS REILLY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 09-2465 |
| | : | |
| UPPER DARBY TOWNSHIP, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

**MEMORANDUM**

YOHN, J.                                                        August 16, 2011

Shamus Reilly brings this action against Upper Darby Township ("Upper Darby"),

alleging discrimination in violation of the Americans with Disabilities Act of 1990 (the "ADA"),

42 U.S.C. §§ 12101 *et seq.*, and the Pennsylvania Human Relations Act (the "PHRA"), 43 Pa.

Stat. Ann. §§ 951 *et seq.* Reilly, a former Upper Darby police officer, suffers from a progressive

degenerative neurological disease, and he claims that Upper Darby discriminated against him by

failing to provide a reasonable accommodation for his disability and instead terminating him.

Upper Darby has filed a motion for summary judgment under Federal Rule of Civil Procedure

56, arguing that Reilly's claims are time-barred and that, in any event, his claims must fail as a

matter of law. For the reasons set forth below, I will deny Upper Darby's motion for summary

judgment.

## I.       FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Reilly was hired as a police officer by Upper Darby in October 1997 and was classified as a patrol officer throughout his course of employment. (Def.'s Statement of Undisputed Facts ("Def.'s Facts") ¶¶ 1–3.)

In 2001 Reilly was diagnosed with inclusion body myositis, a slowly progressive degenerative neurological disease that has caused weakness in his legs. (*Id.* ¶ 4; Pl.'s Counterstatement of Disputed and Undisputed Material Facts ("Pl.'s Facts") ¶¶ 4–5.) As a result of this condition, Reilly has difficulty running, climbing steps without assistance, and getting up from a seated position. (Pl.'s Facts. ¶ 6.) Reilly did not initially inform anyone in the police department of his diagnosis and continued to work as a patrol officer (Def.'s Facts ¶ 6.).

By 2007 Reilly's fellow officers noticed that he had difficulty climbing steps and that he fell "once in while," and he told them that he had a "leg problem." (Def.'s Mot. for Summ. J. Ex. 16, Dep. of Shamus Sean Reilly (Mar. 4, 2011) ("Reilly Dep.") at 25:6–23.) In June 2007 Reilly was called to a meeting with Captain Anthony Paparo, as well as his immediate supervisors, Sergeant Donald Peterson and Lieutenant John Burke, to address concerns about his physical ability to serve on patrol. (Pl.'s Facts ¶¶ 10–11.) Reilly told them about his medical condition, and he was informed that he was being taken off patrol duty and placed in an "alternate duty" position in the control room.[2] (*Id.* ¶¶ 12–14.)

---

[1] Except as otherwise noted, the following facts are undisputed.

[2] Reilly testified that Captain Paparo said that he wanted to give Reilly a full-time position as a uniformed officer in the control room. (Reilly Dep. at 24:9–12.) Upper Darby, however, contends that Reilly was told that he was being assigned to the control room on a temporary basis. (Def.'s Resp. to Pl.'s Statement of Undisputed Facts ("Def.'s Resp. to Pl.'s Facts") ¶ 13.)

Reilly underwent a "fitness for duty" evaluation on August 3, 2007, at the request of Upper Darby. (Pl.'s Facts ¶ 21.) Dr. Harvey Bishow, an orthopedic surgeon selected by Upper Darby for this purpose, reported that he "[did] not feel that [Reilly] is capable of performing the requirements specific to the duties of a police officer for the Upper Darby Township Police Department" but that Reilly was able to work in the "light duty" position to which he had recently been assigned. (Def.'s Facts ¶ 15; Def.'s Mot. for Summ. J. Ex. 8, at 2.)

In preparation for a scheduled meeting with Thomas J. Judge, Jr., Upper Darby's chief administrative officer, Reilly drafted a list of alternative jobs that he believed he could perform, including working as a property-room officer; assisting in the Investigations Division by photographing evidence, processing crime scenes, delivering evidence to the state police laboratory, and preparing criminal complaints and affidavits; assisting in the Administration/Training Division by assisting in fleet maintenance, entering incident reports, and assisting in firearms and CPR training; and working in the operations (or control) room. (Def.'s Mot. for Summ. J. Ex. 7.)

On September 18, 2007, Reilly met with Superintendent Chitwood, who told him that he would be placed on non-service-connected disability[3] sometime in October in light of Dr. Bishow's medical report. (Def.'s Facts ¶ 26.) And on October 4, 2007, Reilly was told that his employment was being terminated because of his inability to perform the duties of a police officer. (Pl.'s Facts ¶ 34; Def.'s Mot. for Summ. J. Ex. 17, Dep. of Michael Chitwood (Mar. 24, 2011) ("Chitwood Dep.") at 34:4–9.) Reilly was told that he was being placed on non-service-

---

[3] Under the applicable collective bargaining agreement, police officers who had completed at least three years of service and who were discharged because of a non-service-connected disability were entitled to disability benefits. (Def.'s Mot. for Summ. J. Ex. 2.)

connected disability and that he would be permitted to first use any accrued unused sick and vacation time until all his paid time off was exhausted. (Def.'s Facts ¶ 21; Pl.'s Facts ¶ 34.) Reilly's vacation and sick leave was exhausted on September 25, 2008. Upper Darby allowed other police officers to donate their unused sick leave to Reilly, and this donated leave was exhausted on October 24, 2008. (Def.'s Mot. for Summ. J. Ex. 15.)

Meanwhile, a representative of Reilly's union, Delaware County Lodge 27, Fraternal Order of Police, filed a grievance on Reilly's behalf on November 1, 2007, claiming that the action taken by Upper Darby violated the collective bargaining agreement. (Pl.'s Facts ¶ 35; Def.'s Mot. for Summ. J. Ex. 3.) Superintendent Chitwood denied the grievance on November 15, 2007 (Def.'s Mot. for Summ. J. Ex. 4), and an arbitrator ultimately concluded, on October 14, 2008, that Upper Darby had not violated the collective bargaining agreement (*id.* Ex. 14).

Reilly filed a charge with the Equal Employment Opportunity Commission (the "EEOC") on January 14, 2009, alleging that Upper Darby had violated the ADA; Reilly cross-filed the charge with the Pennsylvania Human Relations Commission (the "PHRC"), alleging discrimination under the PHRA. (Def.'s Mot. for Summ. J. Ex. 13.) In a notice dated February 27, 2009, the EEOC dismissed the charge as untimely and notified Reilly of his right to sue. (*Id.* Ex. 12.)

Reilly filed this action against Upper Darby on June 1, 2009, and filed an amended complaint on July 23, 2009, alleging discrimination in violation of the ADA (count I) and the PHRA (count II). He claims that Upper Darby discriminated against him by failing to provide a reasonable accommodation for his disability and instead terminating him. Upper Darby moved to dismiss Reilly's amended complaint, arguing (1) that Reilly did not timely file his charge of

4

discrimination with the EEOC and therefore failed to meet the prerequisites for filing suit under

the ADA, and (2) that Reilly filed this suit before the expiration of the one-year conciliation

period required by the PHRA. Reilly argued in response that the time for him to file his charge

with the EEOC should be tolled because he never saw notices posted about his rights under the

ADA. Because I concluded that Reilly should have the opportunity to conduct discovery to

demonstrate that he is entitled to equitable tolling, I denied Upper Darby's motion to dismiss

Reilly's ADA claim. But because Reilly did not dispute that his PHRA claim was premature, I

dismissed that claim without prejudice to his right to reinstate it if his PHRA claim was not

resolved within the one-year conciliation period. *See Reilly v. Upper Darby Township*, No. 09-

2465, 2010 WL 55296 (E.D. Pa. Jan. 6, 2010). Reilly filed a second amended complaint on

February 2, 2010, after the one-year conciliation period expired, reinstating his disability-

discrimination claim under the PHRA.

 After discovery, Upper Darby filed this motion for summary judgment.


## II. STANDARD OF REVIEW

 A motion for summary judgment shall be granted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to

find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv.

Co.*, 391 U.S. 253, 289 (1968)).

 The moving party bears the initial burden of showing that there is no genuine issue of

material fact and that it is entitled to relief. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). Once the moving party has met its initial burden, the nonmoving party must present

"specific facts showing that there is a *genuine issue for trial*," *Matsushita*, 475 U.S. at 587

(internal quotation marks omitted), offering concrete evidence supporting each essential element

of its claim, *see Celotex*, 477 U.S. at 322–23. The nonmoving party must show more than "[t]he

mere existence of a scintilla of evidence" for elements on which it bears the burden of

production, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and may not "rely merely

upon bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. v. DuFresne*, 676

F.2d 965, 969 (3d Cir. 1982). By the same token, "it is inappropriate to grant summary judgment

in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would

be compelled to find its way on the facts needed to rule in its favor on the law." *El v. SEPTA*, 479

F.3d 232, 238 (3d Cir. 2007) (footnote omitted).

When evaluating a motion for summary judgment, the court "is not to weigh the evidence

or make credibility determinations." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,

998 F.2d 1224, 1230 (3d Cir. 1993). "The evidence of the nonmovant is to be believed, and all

justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "Summary

judgment may not be granted . . . if there is a disagreement over what inferences can be

reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms, Inc. v.

John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (internal quotation marks omitted). "[A]n

inference based upon a speculation or conjecture," however, "does not create a material factual

dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914

F.2d 360, 382 n.12 (3d Cir. 1990).

## III.   DISCUSSION

Upper Darby argues that Reilly's claims under the ADA and the PHRA are time-barred and that, in any event, his claims must fail as a matter of law. Because courts "generally interpret the PHRA in accord with its federal counterparts," and the Third Circuit has thus recognized that it is proper to treat ADA and PHRA claims collectively, I will reference only the ADA in this discussion. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996); *see also Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n.3 (3d Cir. 2010).

### A.   The Timeliness of Reilly's Claims

In order to maintain an action under the ADA, a plaintiff claiming disability discrimination in Pennsylvania, which is a deferral state, must first file a charge with the EEOC within 300 days of the alleged unlawful act. *See* 42 U.S.C. § 12117(a); *id.* § 2000e-5(e)(1); *see also Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000). (The statute of limitations is shorter under the PHRA; claims under that statute must be filed with the PHRC within 180 days of the alleged unlawful act. *See* 43 Pa. Stat. Ann. § 959(h).) Where, as here, the plaintiff claims that he was unlawfully terminated, the statute of limitations begins to run "when the employer has reached a definitive conclusion to terminate the individual's employment" and that individual "receives unequivocal notice" of the decision. *Bailey v. United Airlines*, 279 F.3d 194, 199 (3d Cir. 2002) (internal quotation marks omitted); *see also Del. State Coll. v. Ricks*, 449 U.S. 250 (1980).

Reilly does not dispute that the statute of limitations began to run on October 4, 2007,

when he was officially informed of Upper Darby's decision to terminate him,[4] and that he filed

his EEOC charge more than 300 days after that date (he filed his charge on January 14, 2009).

Instead, he argues that the limitations period should be tolled because Upper Darby did not post

the notices regarding fair employment practices required under both federal and state law and he

was therefore unaware of his rights under the ADA and the time limits for filing a discrimination

claim.

Under federal law, employers are required to post, in conspicuous places, notices of fair

employment practices, including descriptions of pertinent provisions of the ADA. *See* 42 U.S.C.

§ 12115; *id.* § 2000e-10(a). (The PHRA contains a similar requirement. *See* 43 Pa. Stat. Ann.

§ 955(j); 16 Pa. Code § 43.1.) An employer's "[f]ailure to post the required notice will toll the

running of the [limitations] period, at least until such time as the aggrieved person seeks out an

attorney or acquires actual knowledge of his rights under the [statute]." *Bonham v. Dresser*

*Indus., Inc.*, 569 F.2d 187, 193 (3d Cir. 1977).

Here, there is a dispute as to whether Upper Darby posted the required notices in the

Police Department. Upper Darby contends that the evidence "establish[es] that appropriate

---

[4] Although Superintendent Chitwood told Reilly on September 18, 2007, that he would be placed on non-service-connected disability sometime in October, Upper Darby apparently contends that Reilly did not receive "unequivocal notice" of Upper Darby's "definitive conclusion" to terminate him until October 4, 2007.

The fact that Reilly remained on Upper Darby's payroll until he exhausted his vacation and sick leave, as well as the leave donated by other police officers, on October 24, 2008, is not relevant in determining when the limitations period began. *See Ricks*, 449 U.S. at 258 ("[T]he proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful." (internal quotation marks omitted)). Nor is it relevant that Reilly filed a grievance challenging his termination. *See id.* at 261 ("The pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods.").

notices were posted." (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. at 2.) But, as Reilly points out, in making that assertion Upper Darby is relying solely on the testimony of Thomas J. Judge, Jr., the chief administrative officer of Upper Darby, who testified that "in 2004 we posted [the notices]," but further testified that "I cannot honestly say at the time, when Officer Reilly was experiencing his issues, it was posted or not. (Def.'s Mot. for Summ. J. Ex. 18, Dep. of Thomas J. Judge, Jr. (Mar. 24, 2011) ("Judge Dep.") at 21:12–19.) Judge conceded that "[s]omeone may have taken [the notices] down," explaining that Upper Darby has "experienced periodic removal of information from our posters so that other people can put other posters up there." (*Id.* at 21:19–23.) Superintendent Chitwood similarly testified that although it was Upper Darby's policy to post the required notices and although he believed that the notices were posted at the time of his deposition, he did not know whether the notices were posted when Reilly was employed by Upper Darby as a police officer. (*See* Chitwood Dep. at 40:14–41:9.) Moreover, Reilly testified that he never saw any postings advising him of his rights under the ADA and other anti-discrimination statutes. (*See* Reilly Dep. at 61:13–62:22.) He testified that he saw other items, including wanted posters and newspaper articles about officers killed or wounded in the line of duty, posted on the bulletin board in Police Department's roll-call room but that he never saw a notice regarding fair employment practices on that bulletin board. (*Id.* at 62:2–6.) Whether Upper Darby posted the required notices is thus a question of fact for the jury.

Upper Darby contends that even if the notices were not posted, the limitations period should not be tolled here because Reilly was represented by an attorney when he filed his grievance under the collective bargaining agreement, which was well within the limitations period. But that attorney, Stanton Miller, represented the police officers' union, Delaware County

Lodge 27, Fraternal Order of Police, not Reilly. Reilly did not hire Miller. Rather, Miller was engaged by the union for the limited purpose of pursuing the grievance and arbitration of Reilly's termination, and the union paid for and directed Miller's work. Miller asserts that he does not practice in the area of employment discrimination and did not discuss with Reilly his (Reilly's) rights under the anti-discrimination laws or provide any advice regarding a potential discrimination claim. (*See* Decl. of S. Stanton Miller, Jr., in Supp. of Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. (May 4, 2011) ¶¶ 3–13.)[5] In my view, this is not the type of contact with an attorney that the Third Circuit was contemplating when it asserted that an employer's failure to post the required notice will toll the limitations period "at least until such time as the aggrieved person *seeks out an attorney* or acquires actual knowledge of his rights." *Bonham*, 569 F.2d at 193 (emphasis added).[6]

---

[5] In his deposition, Reilly could not recall whether he had discussed his rights under the ADA, or the filing of an EEOC charge, with Miller. When asked whether he spoke with Miller about filing any claims other than the grievance against Upper Darby, Reilly testified, "Not that I recall." (Reilly Dep. at 41:14–17.) And when later asked more specifically whether he discussed with Miller "other rights that [he] might have including filing claims with the EEOC or [an] ADA claim," Reilly testified, "I think—again, I apologize, it was a long time ago. I think something was discussed about further filings, I don't remember offhand." (*Id.* at 58:5–14.)

[6] Upper Darby cites *Zellars v. Philadelphia School District*, No. 95-1603, 1997 WL 230803 (E.D. Pa. May 1, 1997), *aff'd without opinion*, 127 F.3d 1098 (3d Cir. 1997), in which the court concluded that equitable tolling was not warranted, even though there was no dispute that the plaintiff's employer had not posted the notices regarding fair employment practices required under federal and state law. As Upper Darby points out, the court asserted that because the plaintiff was represented by counsel provided by his union at an arbitration hearing regarding his termination, the plaintiff "had access to a means of discovering basic information about his rights under Title VII." *Id.* at *1. But that was not the only reason given by the court for denying equitable tolling; the court relied on two other facts not present here. First, the plaintiff expressly stated that during the arbitration hearing he had raised a question about being discriminated against. And second, although the employer had not posted the required notices, the plaintiff did not dispute that he had received an employee handbook that included a notice advising him of his rights. *Id. Zellars* is thus not informative here.

Upper Darby further contends that tolling is inappropriate because Reilly was aware of his rights under the ADA, notwithstanding any failure by Upper Darby to post the required notices. Several courts that have considered the issue have held that an employer's failure to post the required notices will toll the limitations period "only until the employee acquires *general* knowledge of his right not to be discriminated against on account of [a disability]." *McClinton v. Ala. By-Products Corp.*, 743 F.2d 1483, 1486 (11th Cir. 1984); *see also Schroeder v. Copley Newspaper*, 879 F.2d 266, 271–72 (7th Cir. 1989) (adopting the standard set forth in *McClinton*); *Kale v. Combined Ins. Co. of Am.*, 861 F.2d 746, 753 (1st Cir. 1988) ("Once an employee is 'generally aware of his legal right to obtain redress for [the] wrong . . . , he possesses sufficient knowledge to enable him to vindicate his rights if he so desires.'" (quoting *McClinton*, 743 F.2d at 1486)); *DeBrunner v. Midway Equip. Co.*, 803 F.2d 950, 952 (8th Cir. 1986) (adopting the standard set forth in *McClinton*). These courts have asserted that it is not necessary "to toll the [limitations] period up to the time that the employee obtains knowledge of his *specific* rights" under the anti-discrimination statute or the existence of the specific limitations period. *McClinton*, 743 F.2d at 1486. The Third Circuit, however, has said that "from the employee's viewpoint this is a less generous basis for tolling than that articulated in *Bonham*," and has suggested that the limitations period should be tolled until an employee has "full knowledge of anti-discrimination laws and procedures including all information which would be given by a notice posted pursuant to [the statute]." *Callowhill v. Allen-Sherman-Hoff Co.*, 832 F.2d 269, 272 n.3 (3d Cir. 1987) (explaining that "an employee with full knowledge of anti-discrimination laws and procedures including all information which would be given by a notice posted pursuant to [the statute] would not be entitled to a tolling of any limitation period merely because the notice

11

was not posted, as the employer's failure to post the notice would not have prejudiced the employee"). In addition to informing employees that the ADA prohibits disability discrimination, the notice prepared by the EEOC states that there are time limits for filing a charge of discrimination and advises prompt action if an employee suspects discrimination, although the notice does not include any specific information about the limitations period.[7] In any event, under both the standard suggested by the Third Circuit and the standard adopted by the other circuits, a genuine question of fact exists as to Reilly's knowledge of his rights under the anti-discrimination laws.

Upper Darby contends that Reilly was aware of his rights under the ADA as early as September 18, 2007, when he met with Superintendent Chitwood. According to Superintendent Chitwood's handwritten notes from that meeting, Reilly "stated that [his] lawyer was going to get

---

[7] With respect to disability discrimination, the "Equal Employment Opportunity is the Law" poster prepared by the EEOC provides:

> **DISABILITY**
> Title I and Title V of the Americans with Disabilities Act of 1990, as amended, protect qualified individuals from discrimination on the basis of disability in hiring, promotion, discharge, pay, fringe benefits, job training, classification, referral, and other aspects of employment. Disability discrimination includes not making reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, barring undue hardship.

"EEO is the Law" Poster, *available at* http://www1.eeoc.gov/employers/poster.cfm (last visited Aug. 3, 2011). The poster also tells employees what to do if they believe that they have been discriminated against:

> **WHAT TO DO IF YOU BELIEVE DISCRIMINATION HAS OCCURRED**
> There are strict time limits for filing charges of employment discrimination. To preserve the ability of EEOC to act on your behalf and to protect your right to file a private lawsuit, should you ultimately need to, you should contact EEOC promptly when discrimination is suspected . . . .

*Id.*

involved via ADA." (Def.'s Mot. for Summ. J. Ex. 19.) Reilly, however, has stated that he has

"no independent recollection of making any statements during that meeting regarding either

hiring an attorney or asserting any rights under the ADA." (Decl. of Shamus Reilly in Opp'n to

Def.'s Mot. for Summ. J. ("Reilly Decl.") ¶ 2.) According to Reilly, at the time of that meeting,

he "had not yet consulted or retained legal counsel regarding any rights [he] may have had under

the ADA." (*Id.* ¶ 3.) Reilly has asserted that he "was unaware of any filing deadlines or statute of

limitations for filing a charge of disability discrimination under the ADA" (*id.* ¶ 4), the existence

of which is information that would be given in the required notice. And other than

Superintendent Chitwood's notes, there is no evidence in the record from which a jury could

reasonably conclude that Reilly had even a general awareness of his rights under the ADA.

Because genuine questions of fact exist as to whether Upper Darby posted the required

notices regarding fair employment practices and whether Reilly was otherwise aware of his rights

under the ADA, Reilly's entitlement to equitable tolling, and thus the timeliness of Reilly's

claims, cannot be resolved on this motion for summary judgment.

**B.      The Merits of Reilly's Claims**

Upper Darby contends that even if Reilly's claims are not time-barred, they must

nonetheless fail as a matter of law.

The ADA "prohibits certain employers from discriminating against individuals on the

basis of their disabilities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 475 (1999). The statute

provides: "No covered entity shall discriminate against a qualified individual with a disability

because of the disability of such individual in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms,

conditions, and privileges of employment." 42 U.S.C. § 12112(a).[8] Discrimination under the

ADA encompasses not only such disparate treatment but also the failure to provide a reasonable

accommodation for an individual's disability. The ADA provides that an employer engages in

discrimination when it does "not mak[e] reasonable accommodations to the known physical or

mental limitations of an otherwise qualified individual with a disability . . . , unless [the

employer] can demonstrate that the accommodation would impose an undue hardship on the

operation of the [employer's] business." 42 U.S.C. § 12112(b)(5)(A).

Reilly claims that Upper Darby discriminated against him by failing to provide a

reasonable accommodation for his disability and instead terminating him.

To establish a prima facie case of discrimination under the ADA, a plaintiff such as

Reilly must show that (1) he has a disability within the meaning of the ADA; (2) he is otherwise

qualified to perform the essential functions of the job, with or without reasonable

accommodations by the employer; and (3) he has suffered an adverse employment decision as a

result of discrimination. *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir.

---

[8] Amendments to the ADA took effect on January 1, 2009. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). Because the events giving rise to Reilly's claims occurred before these amendments became effective, and because the parties do not contend that these amendments have retroactive effect, I refer to the law as it existed at the time the events took place. *See Britting v. Sec'y, Dep't of Veterans Affairs*, No. 10-2554, 2011 WL 300240, at *2 (3d Cir. Feb. 1, 2011) (not precedential) (holding that the amendments "cannot be applied retroactively"); *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 n.2 (3d Cir. 2010) (applying "the statute and regulations as they existed during the events in question," where the "parties . . . have not argued that these amendments have retroactive effect"); *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 501 n.5 (3d Cir. 2010) (declining to reach the issue of retroactivity, but noting that "every court of appeals decision of which we are aware has held that the amendments are not retroactive").

2004). Upper Darby argues that Reilly claims must fail because he cannot establish any of these elements of an ADA claim.

### 1.    Does Reilly Have a Disability?

Upper Darby argues that plaintiff is not disabled within the meaning of the ADA and thus cannot sustain a discrimination claim.

A plaintiff such as Reilly can establish that he has a disability by demonstrating that he has "a physical or mental impairment that substantially limits [a] major life activit[y]," 42 U.S.C. § 12102(2)(A), has "a record of such an impairment," *id.* § 12102(2)(B), or is "regarded as having such an impairment," *id.* § 12102(2)(C). Reilly contends that his condition, inclusion body myositis, substantially limits major life activities and thus constitutes a disability under the ADA.

The parties do not dispute that inclusion body myositis constitutes an impairment under the ADA; the issue here is whether Reilly's condition substantially limits a major life activity. The Supreme Court has stressed that "whether a person has a disability under the ADA is an individualized inquiry," *Sutton*, 527 U.S. at 483, and that courts must "determine the existence of disabilities on a case-by-case basis," *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999). In engaging in that individualized inquiry, a court must first identify the specific life activities that the plaintiff claims are affected and determine whether those activities are "major life activities" under the ADA, and then must evaluate whether the plaintiff's impairment substantially limits those major life activities. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306–07 (3d Cir. 1999).

15

Reilly contends that his condition, which has caused weakness in his legs, substantially limits him in the activities of walking and working, both of which are major life activities under the EEOC regulations,[9] *see* 29 C.F.R. § 1630.2(i).

Reilly contends first that his condition substantially limits his ability to walk. This claim, however, is belied by his deposition testimony. Reilly testified that the only things he could not do that affected his ability to do his job as a police officer were run and climb steps without the assistance of a railing. (Reilly Dep. at 27:15–24.) And when asked specifically whether he had problems walking, he said no. (*Id.* at 28:8–14.)[10]

_____

[9] As the Third Circuit has explained, "[t]he Supreme Court left unresolved in *Sutton* what deference, if any, [the EEOC] regulations are due. . . . The Court concluded that it did not have to resolve the issue of deference because the parties . . . did not contest the validity of the regulations . . . that interpret the generally applicable provisions." *Taylor*, 184 F.3d at 307. The Third Circuit has applied the EEOC regulations, *see, e.g.*, *Williams*, 380 F.3d at 762; *Taylor*, 184 F.3d at 307, and neither party has challenged the regulations here.

With respect to the question whether working is a major life activity under the ADA, the Third Circuit has deferred to the EEOC's regulations and interpretive guidelines in asserting that it is. *See Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 783–84 (3d Cir. 1998). In *Sutton*, however, the Supreme Court questioned whether working can be considered a major life activity under the ADA, but because the parties accepted that the term "major life activities" includes working, the court assumed, without deciding, that working is a major life activity. *See* 527 U.S. at 490–92. In *Williams*, a case decided after *Sutton*, the Third Circuit considered whether the plaintiff was substantially limited in his ability to work without questioning whether working is in fact a major life activity under the ADA, presumably because the defendant did not raise the issue. 380 F.3d at 762–65. Because Upper Darby has not contested that working is a major life activity, I will similarly assume that it is.

Under the EEOC's interpretive guidelines, an individual's ability to work should be considered only if the individual is not substantially limited with respect to any other major life activity. *See* 29 C.F.R. pt. 1630 app. § 1630.2(j) ("If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working.").

[10] Reilly testified as follows:
Q: Now, in terms of your ability to do the job of an active duty police officer, patrol officer, was there anything in particular that you could not do?
A: Run.

16

Reilly next contends that his condition substantially limits him in the major life activity of working. With respect to the major life activity of working, the EEOC regulations define the term "substantially limits" to mean "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). The regulations explain that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* There is no dispute here that Reilly is unable to perform the job of a patrol officer. But Upper Darby challenges Reilly's claim that his condition significantly restricts his ability to perform a class of jobs.

The Third Circuit has asserted that law enforcement constitutes a class of jobs. *See Williams*, 380 F.3d at 764. In *Williams*, the plaintiff, a police officer, suffered from depression and as a result was unable to carry a firearm. Noting that the only job available in the defendant's police department that did not require the use of a firearm was a position in the radio room, and further that the defendant had not challenged, for summary-judgment purposes, the plaintiff's contention that he was incapable of working in most law-enforcement positions because of his

---

Q: Anything else?
A: Climb steps without assistance.
Q: What type of assistance?
A: Railing.
Q: Anything else?
A: That's all I can think of offhand.
. . . .
Q: Did you have any problems getting up from a seated position and walking?
A: Walking, no. Getting up, yes.
Q: What kind of problems were presented for getting up?
A: Well, I need to brace myself against the table or the back of the chair to get up.
(Reilly Dep. at 27:15–28:14.)

inability to carry a firearm, the court found that there was sufficient evidence from which a jury could conclude that the plaintiff was significantly restricted in his ability to perform a class of jobs. *See id.* at 764–65.

Here, Upper Darby contends that Reilly is not significantly restricted in his ability to perform jobs in law enforcement, asserting that since his termination from the Upper Darby Police Department, Reilly has worked intermittently for two private investigative firms. It is not clear from the record, however, what those jobs entailed and whether those jobs may be considered jobs in law enforcement. And neither party has offered any other evidence as to Reilly's ability to perform other jobs in law enforcement. There is thus not enough evidence at this stage to determine whether, as a matter of law, plaintiff is substantially limited in his ability to perform a class of jobs; this remains a question of fact to be decided by a jury.[11]

### 2.    Is Reilly a Qualified Individual?

Upper Darby also contends that Reilly cannot establish the second element of a prima facie case, namely, that he is a "qualified individual."

A qualified individual is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Upper Darby argues that Reilly cannot establish that he is a qualified individual because it is undisputed that Reilly could no longer perform the job of a patrol officer.

---

[11] Upper Darby also seems to argue that Reilly is not precluded from performing a broad range of jobs because he is capable of performing various clerical jobs—as evidenced by his letter to Judge identifying various jobs that he thought he could perform. But "even if one has the ability to perform a broad range of jobs, one is nevertheless disabled if one is significantly restricted in one's ability to perform [a class of jobs]." *Williams*, 380 F.3d at 763.

18

But Upper Darby seemingly misunderstands the definition of a "qualified individual." Under the ADA, a reasonable accommodation includes "reassignment to a vacant position," 42 U.S.C. § 12111(9)(B), and Reilly is a qualified individual even if he is no longer able to perform the job of a patrol officer, as long as he is able to perform *another job* available in the police department, *see Williams*, 380 F.3d at 768–69 (finding that a jury could conclude that disabled police officer was a qualified individual to the extent that plaintiff was qualified to work in the radio room even though he was unable to carry a firearm and thus unable to perform the work of a patrol officer); *see also Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1161 (10th Cir. 1999) (explaining that "a 'qualified individual with a disability' includes a disabled employee who desires and can perform with or without reasonable accommodation an available reassignment job within the company, though unable to perform his or her existing job").

Here, Reilly has produced sufficient evidence from which a jury could reasonably conclude that he was able to perform the essential functions of a position in the control room, a position to which he was temporarily assigned when he was removed from patrol duty and a position he sought as a reasonable accommodation. Superintendent Chitwood testified that he was not aware of any issues with Reilly's performance when Reilly was assigned to the control room and was not aware of any medical reasons why Reilly could not perform the control-room job. (*See* Chitwood Dep. at 22:23–23:8.) And when asked whether there was any reason that Reilly could not perform the control-room job, Superintendent Chitwood cited only budgetary reasons. (*See id.* at 24:24–26:13 (explaining that Upper Darby had a limited number of budgeted positions for police officers and so assigning Reilly to the control room on a full-time basis

would reduce the number of police officers available for patrol duty).)[12] A jury could thus

reasonably conclude that Reilly was a qualified individual.[13]

### 3.    Did Upper Darby Discriminate Against Reilly by Failing to Provide a Reasonable Accommodation?

Finally, Upper Darby contends that even if Reilly is a qualified individual with a

disability, it did not violate any duty it may have had to provide a reasonable accommodation for

Reilly.

As stated above, the failure to make a reasonable accommodation for a qualified

employee with a disability constitutes discrimination under the ADA unless the employer can

---

[12] Upper Darby nonetheless asserts that Reilly's "inability to rise from a chair without great difficulty and his propensity for falling still makes it a danger to him to perform in that function even though it is light duty." (Def.'s Resp. to Pl.'s Facts ¶ 18; *see also id.* ¶ 19.) There is no evidence, however, to support its assertion. Upper Darby seems to rely on the arbitrator's opinion with respect to Reilly's grievance—in particular, the arbitrator's statements summarizing Captain Anthony Paparo's testimony for Reilly's condition compromised his safety, even in the control room. (*See* Def.'s Mot. for Summ. J. Ex. 14, at 2, 4.) But the arbitrator's summary of Captain Paparo's testimony—to the extent offered for the truth of the matter asserted, namely, that Reilly cannot perform a job in the control room—is hearsay and would not be admissible at trial. Accordingly, it may not be considered on summary judgment. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) (explaining that hearsay statements may be considered for purposes of summary judgment only to the extent they would be admissible at trial). And Captain Paparo's deposition was not taken here.

Upper Darby's concern that Reilly's condition would compromise his safety in the control room highlights the importance of the interactive process, which is discussed in more detail in the next subsection. Reilly asserts that no one expressed any concern to him about his safety in the control room, and he contends that he could have worn leg braces to the extent that Upper Darby was concerned about the risk of his falling in the control room. (*See* Reilly Decl. ¶¶ 7–9.)

[13] Reilly prepared a list of several other jobs that he thought he could perform. (*See* Def.'s Mot. for Summ. J. Ex. 7.) There is no evidence in the record as to whether Reilly was able, with or without reasonable accommodation, to perform the essential functions of those positions. With respect to those jobs Upper Darby has contended only that they were already being performed by others and were not available to Reilly. (*See* Chitwood Dep. at 28:7–33:18.)

demonstrate that the accommodation would impose an undue hardship. *See* 42 U.S.C.

§ 12112(b)(5)(A). The Third Circuit has further explained that the term "'[r]easonable

accommodation' . . . includes the employer's reasonable efforts to assist the employee and to

communicate with the employee in good faith, under what has been termed a duty to engage in

the 'interactive process.'" *Williams*, 380 F.3d at 761 (internal quotation marks and citation

omitted).

Reilly argues that Upper Darby breached its duty to engage in good faith in the interactive

process and discriminated against him by failing to provide a reasonable accommodation and

instead terminating him.

Under the EEOC's interpretive guidelines, "[o]nce a qualified individual with a disability

has requested provision of a reasonable accommodation, the employer must make a reasonable

effort to determine the appropriate accommodation." 29 C.F.R. pt. 1630, app. § 1630.9. The

guidelines assert that "[t]he appropriate reasonable accommodation is best determined through a

flexible, interactive process that involves both the employer and the [employee] with a

disability." *Id.* Although "[t]he interactive process does not dictate that any particular concession

must be made by the employer," it does require that "employers make a good-faith effort to seek

accommodations." *Taylor*, 184 F.3d at 317.

Here, Reilly requested an accommodation in the form of a reassignment and, in a letter

addressed to Judge, Upper Darby's chief administrative officer, provided a list of jobs that he

thought he could perform. There is no evidence, however, that Upper Darby responded in any

way to Reilly's letter suggesting alternatives to patrol duty. Indeed, although he asserted that he

could not speak for other Upper Darby employees, Judge testified that he "did not explore any

21

alternatives under the ADA." (Judge Dep. at 32:11–19.) A genuine question of fact thus exists as to whether Upper Darby engaged in good faith in the interactive process.

The Third Circuit has asserted that where, as here, "there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded." *Taylor*, 184 F.3d at 318. On the other hand, the Third Circuit has also asserted that "if reasonable accommodation is impossible, nothing more than communication to the employee of this fact is required," *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997), and has made it clear that "a plaintiff . . . who claims that the defendant engaged in discrimination by failing to make a reasonable accommodation cannot recover without showing that a reasonable accommodation was possible," *Williams*, 380 F.3d at 772 (internal quotation marks omitted).

Upper Darby argues that it did not have to participate in the interactive process because accommodation was not possible—it contends that the jobs to which Reilly sought reassignment, including the position in the control room to which he had been temporarily assigned, were not available.

Upper Darby asserts that Reilly's "alternative duty" assignment in the control room was, under Police Department policy, temporary in nature. Upper Darby explains that the "alternative duty assignment" policy is designed to allow police officers who are unable to perform their regular duties because of illness or injury to continue working until they are able to return to their regular jobs. (*See* Def.'s Mot. for Summ. J. Ex. 11.) Upper Darby asserts that such assignments are only temporary in nature and, citing *Mengine*, 114 F.3d at 418, that it was not required to convert a temporary job into a permanent job to accommodate Reilly's disability.[14] But, as Reilly

---

[14] Noting that "[a]n employer is not required to create a job for a disabled employee," the

points out and as Upper Darby acknowledges, there were also permanent positions in the control room, and Reilly thus contends that there was no need for Upper Darby to create a new position for him or convert a temporary job into a permanent one.

Upper Darby, however, contends that assigning Reilly to such a position in the control room would have imposed an undue hardship on the township and thus would not have been a *reasonable* accommodation.

"Generally, the question of whether a proposed accommodation is reasonable is a question of fact." *Buskirk v. Apollo Metals*, 307 F.3d 160, 170 (3d Cir. 2002). Once a plaintiff shows that a proposed accommodation is possible, the burden shifts to the defendant to prove, as an affirmative defense, that the requested accommodation is unreasonable or would cause an undue hardship. *See Turner v. Hershey Chocolate USA*, 440 F.3d 604, 614 (3d Cir. 2006).

Upper Darby asserts that the permanent control-room positions were performed by part-time civilian employees, not police officers. Upper Darby contends that assigning Reilly, as a full-time police officer, to such a position would pose an undue burden on the township because it has a limited number of budgeted positions for police officers and such an assignment would reduce the number of police officers available for patrol duty. Upper Darby further asserts that the part-time civilian employees earn an hourly wage that is considerably less than that of police officers such as Reilly and, unlike police officers, do not receive any benefits.

---

Third Circuit asserted that the defendant in *Mengine* "was not required to transform its temporary light duty jobs into permanent jobs to accommodate [the plaintiff's] disability." 114 F.3d at 418. Nonetheless, the court was "reluctant to adopt a *per se* rule that the conversion of a temporary job to a permanent job can never constitute a 'reasonable accommodation.'" *Id.* The court suggested that "in most cases the imposition of such a requirement will be unreasonable, but there might arise the rare case in which the cost of converting the temporary job into a permanent one is slight and the benefits considerable." *Id.* at 418–19.

Upper Darby's argument, however, is undermined by Reilly's testimony that during the night shift, the control room is staffed by active-duty police officers who are pulled off patrol to fill the control-room position. (Reilly acknowledges that the control room is staffed by retired police officers (who are considered civilians) and other civilian employees during the day shift.) (*See* Reilly Dep. at 68:11–14.) Reilly concedes that Upper Darby would incur an additional cost to the extent that it assigned him to the control room during the day shift. But, as Reilly correctly notes, the question whether this additional cost is unreasonable or would otherwise pose an undue hardship on Upper Darby is a question for a jury. Moreover, Reilly contends that because patrol officers rotated through the control-room position during the night shift, Upper Darby would not incur any additional cost to the extent that it assigned him to the control room only during the night shift.

In addition, Reilly suggests that he would have accepted a civilian position in the control room. He concedes that Upper Darby has a residency requirement for civilian employees and that, because he lives outside the township, he is ineligible for a civilian position. But he contends that he would have been willing and able to move if necessary in order to accept a civilian position.

This is sufficient to raise a genuine issue of fact as to the reasonableness of Reilly's proposed accommodation. And this highlights "the importance of communication and cooperation between employers and employees in seeking reasonable accommodations." *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 149 (3d Cir. 1998). As the Third Circuit has explained, "an employer who fails to engage in the interactive process runs a serious risk that it will erroneously overlook an opportunity to accommodate a statutorily disabled employee." *Id.* Had Upper Darby

engaged in good faith in the interactive process, it might have discovered that a reasonable accommodation was possible.

## IV.     CONCLUSION

Upper Darby argues that it is entitled to summary judgment, challenging Reilly's claims on two separate grounds.

Upper Darby argues first that Reilly's claims are time-barred. But because genuine questions of fact exist as to whether Upper Darby posted the required notices regarding fair employment practices and whether Reilly was otherwise aware of his rights under the ADA, Reilly's entitlement to equitable tolling, and thus the timeliness of Reilly's claims, cannot be resolved on this motion for summary judgment.

Upper Darby next argues that Reilly cannot establish a prima facie case of discrimination and that his claims must therefore fail as a matter of law. But genuine questions of fact exist as to whether Reilly is a qualified individual with a disability and as to whether Upper Darby engaged in good faith in the interactive process and unlawfully failed to provide a reasonable accommodation for Reilly.

Accordingly, I will deny Upper Darby's motion for summary judgment. An appropriate order accompanies this memorandum.